AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:20-MJ-4711 |
| The person of Jonathan Joseph Nasser | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A( a) (2)(A) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2252A( a) (5)(B) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Clint Wilmsen, Federal Bureau of Investigation
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA _____

Hon. John McDermott, United States Magistrate Judge
*Printed name and title*

AUSA: Jeffrey Chemerinsky x6520

**AFFIDAVIT**

I, Clint Wilmsen, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed since December 2002.  As an FBI SA, I received training at the FBI Academy and other Law Enforcement Training venues.  I was trained to manage and run criminal investigations, including online investigations utilizing the identification and research of social media along with email and IP address tracking and analysis.  I received a Bachelor of Arts degree in English from California State Polytechnic University, Pomona, and a Juris Doctorate degree from the University of California, Los Angeles.  I am currently assigned to the FBI's Los Angeles Field Office, West Covina Resident Agency, where my duties include the investigation of federal crimes, including crimes involving child pornography.

2.  During my employment with the FBI, I have participated in numerous investigations involving complex federal crimes, including international investment schemes, government program fraud, public corruption, national security, online extortion, and child pornography.  I have conducted interviews, IP address research and analysis, search warrant executions, evidence collection, and evidence review in support of child pornography investigations.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.     This affidavit is made in support of an application for a warrant to search premises located at 413 Underhill Drive, Glendora, California 91741 (the "SUBJECT PREMISES"), more fully described below and in Attachment A-1, which is attached hereto and incorporated herein by reference, and the person of Jonathan Joseph Nasser ("J.J. NASSER" or the "SUBJECT PERSON"), more fully described below and in Attachment A-2, which is attached hereto and incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.     As set forth below, on February 24, 2020, an FBI Online Covert Employee ("OCE"), a member of the FBI Child Exploitation Task Force in Salt Lake City, Utah ("SLCCETF"), conducted an online undercover session and observed LiveMe username "Bbg051151," the SUBJECT ACCOUNT, post a link to a folder containing videos and images of nude prepubescent children, some engaged in sexual acts with adults and/or other children.  LiveMe records indicated that the SUBJECT ACCOUNT

utilized an IP address associated with address 413 Underhill
Drive, Glendora, California 91741, the SUBJECT PREMISES, and a
telephone number utilized by Jonathan Joseph Nasser, the SUBJECT
PERSON.  Through further investigation, law enforcement
determined that the SUBJECT PERSON lives at the SUBJECT
PREMISES.

### IV. DEFINITION OF TERMS

6.    The following terms have the indicated meaning in this
affidavit:

a. The terms "minor," "sexually explicit conduct,"
"visual depiction," "producing," and "child pornography" are
defined as set forth in Title 18, United States Code, Section 2256.

b. The term "computer" is defined as set forth in Title
18, United States Code, Section 1030(e)(1).

c. The term "email" (electronic mail) is defined as the
messages sent from one person to another via a computer.  Email may
also include files sent as attachments to or embedded within text
messages.  Email can also be sent automatically to a large number
of addresses via a mailing list.

d. The term "Internet" is defined as the worldwide
network of computers—a noncommercial, self-governing network
devoted mostly to communication and research with roughly 500
million users worldwide.  The Internet is not an online service and
has no real central hub.  It is a collection of computer networks,
online services, and single user components.  In order to access
the Internet, an individual computer or digital device user must
use an access provider, such as a university, employer, or

commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e. The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.  IP allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

f. The term "IP Address" is defined as a unique number assigned to each computer or digital device directly connected to the Internet.  Each computer or device connected to the Internet is assigned a unique IP address while it is connected (for example, 172.191.142.150).  The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session.

g. The term "Internet Service Provider" ("ISP") is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software.  A user can also connect to the Internet through a commercial online service such as AT&T, Verizon, or Time Warner Cable.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

h. The term "Cloud Storage" is defined as a network of online storage where data is saved in virtual storage that is hosted by third parties.  The hosting companies operate large data

centers, possibly across multiple servers.  Cloud storage allows
users to save files and data online and access their information
from anywhere using any digital device with an Internet connection.

       i. The terms "jpeg," "jpg," "gif," "bmp," and "art" are
defined as graphic image files, namely, pictures.

       j. The terms "mpeg," "mpg," "mov," "avi," "rm," and "wmv"
are defined as video or movie files.  To use these video files, one
needs a personal computer or other digital device with sufficient
processor speed, internal memory, and hard disk space to handle and
play typically large video files.  One also needs a video file
viewer or client software that plays video files.  One can download
shareware or commercial video players from numerous sites on the
Internet.

### V.  BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND THE USE OF LIVEME AS A MEANS FOR SHARING CHILD PORNOGRAPHY

    7.   Based upon my training and experience in the
investigation of child pornography and with peer-to-peer file
sharing programs, and information related to me by other law
enforcement officers involved in the investigation of child
pornography offenses generally, I know the following information
about the use of computers and child pornography.

    8.   Computers and computer technology have revolutionized
the way in which child pornography is produced, distributed, and
utilized.  Child pornographers can now produce both still and
moving images directly from a common video camera and can scan

5

these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

9.   Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer and digital device users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced, transported, and stored.  For example, with the click of a button, someone trading images and videos containing child pornography with others through an online instant messaging application can be copied and put onto other digital devices or media storage devices such as external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile

digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

10.  LiveMe America, Inc., also known as "Live.me," ("LiveMe"), a social networking and electronic communications service provider headquartered at 7998 Santa Monica Boulevard, Units A & B, West Hollywood, CA 90046.  LiveMe is a popular free mobile application for mobile devices (i.e., smart phones, tablets, iPods, etc.).  LiveMe can be downloaded on Android or iOS devices.  LiveMe permits users to stream live video of themselves to an anonymous audience of LiveMe users who can post comments and interact with people in the video (i.e., give instructions or commands to the user).  LiveMe also allows users to create groups where like-minded individuals can chat and or text with other users and post videos and/or images.  LiveMe utilizes the internet connection through the mobile devices' cellular data plan or through Wi-Fi to send and receive messages, photos, videos, and other content transmitted by users through the LiveMe application.

11.  Each LiveMe user has the ability to create a username, which can be changed at any time.  Every LiveMe account also has a "SID" number which is displayed on the profile page under the username.  The SID number is searchable within the LiveMe application.  The SID number will remain consistent for the specific account even if the username changes.  In addition, every LiveMe account has a Unique Identifier number ("UID") that is hidden from public view and not searchable within the LiveMe application.  No matter how many times a LiveMe user may change a username, the UID will remain consistent for a specific account.

12.  Based on a review of company policy documents, along with information provided by other law enforcement officers, I know that LiveMe collects certain content created by users such as: subscriber/registration information; user posts such as images, video, audio, and text-based communications; data associated with user posts, videos, messaging (including voice and video), or other communications; and information about how users connect to LiveMe, such as IP addresses and certain device information.  Based on other agents' experiences in similar investigations, I am aware that LiveMe maintains the content of chats, images, and videos sent between users.

13.  Providers typically retain certain transactional information about the creation and use of each account on their

systems.  This information can include the date on which the
account was created, the length of service, records of log-in
(i.e., session) times and durations, the types of service
utilized, the status of the account (including whether the
account is inactive or closed), the methods used to connect to
the account, and other log files that reflect usage of the
account.  In addition, providers often have records of the IP
address used to register the account and the IP addresses
associated with particular logins to the account.  Because every
device that connects to the Internet must use an IP address, IP
address information can help to identify which computers or
other devices were used to access the account.

14.  In some cases, users will communicate directly with a
provider about issues relating to their account, such as
technical problems, billing inquiries, or complaints from other
users.  Providers typically retain records about such
communications, including records of contacts between the user
and the provider's support services, as well as records of any
actions taken by the provider or user as a result of the
communications.

15.  Finally, I am aware from my training and experience
that electronic service providers such as LiveMe may report
illegal conduct on their platform, specifically conduct related
to the sexual exploitation of children, to the National Center

for Missing and Exploited Children.  These reports, known as
Cyber Tipline Reports may contain information identifying a
user, images, video, and/or text posted by a user on the
company's servers in violation of terms of service and the law.

16.  Based on my training and experience, I know that chat
applications are often used to communicate with others,
including during the commission of crimes.  In particular, I
know that LiveMe has become popular with individuals who have a
sexual interest in children and images of children to discuss
their interest with other like-minded individuals, including to
share images and videos of child pornography.

17.  Mega Ltd., also known as "Mega," is based in New
Zealand and operates an encrypted, file-hosting and cloud
storage service available through web-based applications and
mobile applications on Windows, iOS, and Android devices.  Mega
offers storage capabilities ranging from 15GB to 8TB.  Mega
mobile application allows users to access and stream files from
a mobile device such as a phone or tablet.  Mega also provides
user controlled end-to-end encryption so intermediaries,
including Mega itself, cannot access user encryption keys or
stored data.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    LiveMe User "Bbg051151" Posted a Link to Child Pornography, Including Images of Prepubescent Penetration**

18.    On February 24, 2020, as part of the investigation into the exploitation of children online, an FBI OCE who is a member of the SLCCETF, conducted an online undercover session on LiveMe.

19.    The SLCCETF OCE accessed a LiveMe group titled "join" which contained users who distributed videos and/or images of nude prepubescent children, including infants and toddlers, engaged in sexual acts with adults and/or other children.  The profile image for the LiveMe group "join" depicted a nude prepubescent female.

20.    The SLCCETF OCE observed that LiveMe username "Bbg051151" (the SUBJECT ACCOUNT) posted a Mega link (https://mega.nz/#F!WIkgRYrb!rKDSW0VLYGYtt3UFRx5uhA) on LiveMe group "join."  The SLCCETF OCE utilized the Mega link to access a folder titled "Kinky1" which contained seven folders totaling 39.27GB of content.  The SLCCETF OCE captured details of approximately seven folders, including, but not limited to, the following folders:

a. "chesepzza1" which contained two folders and 276 files;

b. "CP turbio" which contained 26 folders and 1791 files;

c. "CP turbio" which contained 26 folders and 1791 files;

d. "dos adolecentes en sillon se muestran"[1] which contained 165 files;

e. "file01" which contained 501 files;

f. "new folder" which contained 35 files; and

g. "vids2" and contained one folder and 172 files.

21.  Many of the files previewed by the SLCCETF OCE appeared to be videos and/or images of nude prepubescent children, some engaged in sexual acts with adults and/or other children.

22.  The FBI OCE downloaded 15 videos from Mega folder titled "Kinky1."  Below are descriptions of four of these videos:

a.  Video 1 (titled "8da25a1a-9593-4b6a-bbb2-eabdd09f044e"):  Appeared to depict a nude adult place his erect penis repeatedly into a nude prepubescent female's vagina.

b.  Video 2 (titled "c543886b-001b-457c-bbde-5b3285373402"):  Appeared to depict a nude adult male wearing a clown mask hold a nude prepubescent female's legs apart while placing a cylindrical object repeatedly into the female's vagina.

_____

[1] A machine translation of "dos adolecentes en sillon se muestran" detected Spanish language and produced English translation of "two teenagers in armchairs are shown."

c.   Video 3 (titled "cp dos niñas con hombre en silla de escritorio"[2]):  Appeared to depict an adult male place a female toddler wearing only a shirt in a chair.  The male repeatedly placed his fingers into the female toddler's vagina, then turned the female onto her knees and repeatedly placed his finger into her anus.

d.   Video 4 (titled "cp mg27"):  Appeared to depict a compilation of video scenes.  Two scenes depict adult females placing their tongues on the vagina of prepubescent females.  Two scenes depict nude adult males placing erect penises into the vaginas of toddler females.

**B.   LiveMe User "Bbg051151" Posted a Link to Possible Child Pornography**

23.   On June 16, 2020, as part of the investigation into the exploitation of children online, an FBI OCE, who is a member of the Minneapolis Child Exploitation Task Force ("MPCETF")(the "MPCETF OCE"), conducted online undercover sessions on LiveMe.

24.   The MPCETF FBI OCE observed that LiveMe user "Bbg051151" (the SUBJECT ACCOUNT) was a member of LiveMe group "Wonderland" where the SUBJECT ACCOUNT posted a Mega link (https://mega.nz/#FluShHBBLZ!Le9TBMlRAMckO472bjdQTA).  The MPCETF OCE utilized the Mega link to access a folder titled "4k" which contained 2.36GB of content and 208 files.  The MPCETF OCE

---

[2] A machine translation of "cp dos niñas con hombre en silla de escritorio" detected Spanish and provided an English translation of "cp two girls with man in desk chair."

captured details of approximately 208 files which consisted of primarily videos depicting pubescent minor females and young adult females posed in various sexually explicit behavior. Some file titles are indicative of child pornography such as: (1) "11 yo girl rides the cock and loves it kiddy porn incest sex naughty little girl slut, priceless, pussy, white, ass, gang~1"; (2) "12yr molly cowgirl;" and (3) "2012-01 Littleo (Pthc)(Orgasm)_x264"[3]. However, it is not immediately apparent from the content of the above videos that the videos contain child pornography.

**C.    Communication between FBI OCE and the SUBJECT ACCOUNT**

25.    FBI Minneapolis conducted an investigation of a subject involved in trading child pornography on LiveMe (the "FBI Minneapolis Subject"). On approximately April 22, 2020 and subsequent to obtaining consent, FBI Minneapolis accessed the subject's LiveMe account and observed a conversation between the FBI Minneapolis Subject and the SUBJECT ACCOUNT. It appeared that the SUBJECT ACCOUNT and the FBI Minneapolis Subject engaged in a sexually focused conversation regarding the FBI Minneapolis Subject's ten-year-old cousin. Approximately between April 22, 2020 and June 16, 2020, the MPCETF OCE communicated with the SUBJECT ACCOUNT as follows:

---

[3] The acronym "PTHC" is commonly used as an abbreviation for "Pre-Teen Hard Core" pornography.

**Bbg051151:** what's her snapchat will sent you everything i get from her don't worry i won't hurt her or make her cry

**Bbg051151:** Did you ever get her sbap

**OCE:** Not for lack of trying. My aunt took her off snap. you working on anything good?

**Bbg051151:** im always working on stuff good

**Bbg051151:** [sent image depicting a young female in a bikini.]

**OCE:** Me too. Started working on a new crush.

**Bbg051151:** show me a pic

**OCE:** I haven't screenshotted her yet. Trying to play it smooth. She is super cute tho, and very open.

**Bbg051151:** does she have instagram i wont talk to her i promise. i wanna see what ur into. if you give me one of ur girls social meida ill give you one of mine.

**OCE:** sc [Snapchat account identifier]

**Bbg051151:** hey sorry haven't been on since earlier

**Bbg051151:** i dont add girls with out a bitmoj[4]

**OCE:** Interesting policy, but ok. I'll try to get you a pic anyhow.

**Bbg051151:** theres lots of dudes fishing on snapchat... along with police so yeah.

[The chat ends here]

---

[4] "Bitmoj" appears to refer to a personal emoji consisting of a cartoon avatar.

**D.    The IP Address Used by "Bbg051151" to Post the Child Pornography Links Resolves to SUBJECT PREMISES, Which is occupied by J.J. NASSAR**

26.    On February 24, 2019, FBI SLCCETF served an administrative subpoena to LiveMe for information on the SUBJECT ACCOUNT.  LiveMe responded to the subpoena by providing a record indicating that:

a. The SUBJECT ACCOUNT had registered for LiveMe on January 28, 2020, and was assigned UID 1221873140959944705.

b. The SUBJECT ACCOUNT identified as male and utilized an iPhone 7 device.

27.    LiveMe also provided IP address login information for the SUBJECT ACCOUNT.  On February 22, 2020, the SUBJECT ACCOUNT logged in to LiveMe three times from IP address 47.157.50.207.  On dates ranging from January 27, 2020 through February 24, 2020, the SUBJECT ACCOUNT logged in to LiveMe from a number of IP addresses other than IP address 47.157.50.207.  I conducted an IP address lookup utilizing open source tools and determined that IP address 47.157.50.207 was provided by Frontier Communications.  I conducted IP address lookups on the non-Frontier Communications IP addresses from the LiveMe record utilizing open source tools and determined that the IP addresses were provided by Verizon Wireless.

28.    On March 9, 2020, FBI SLCCETF served an administrative subpoena to Frontier Communications for information regarding IP

address 47.157.50.207.  On March 9, 2020, Frontier
Communications responded to the subpoena by providing a record
that from January 8, 2020 to March 9, 2020 IP address
47.157.50.207 was assigned to customer Joseph A. Nasser at 413
Underhill Drive, Glendora, California 91741, the SUBJECT
PREMISES.

29.  FBI SLCCETF selected three of the Verizon Wireless IP
addresses which were used to log into the SUBJECT ACCOUNT at
specific dates and times, specifically: (1) IP address
174.195.197.249 on February 23, 2020 at 6:33:30 AM UTC[5]; (2) IP
174.195.194.53 on February 22, 2020 at 8:21:45 AM UTC; and (3)
IP 174.195.149.2 on February 21, 2020 at 3:15:24 AM UTC
(collectively the "Selected Verizon Wireless IP Addresses".)

30.  On April 7, 2020, FBI SLCCETF served an administrative
subpoena to Verizon Wireless requesting all telephone numbers
which utilized the Selected Verizon Wireless IP Addresses at
those specific dates and times.  Verizon Wireless provided
records which included approximately 566 telephone number
records.  On approximately April 10, 2020, FBI SLCCETF conducted
an analysis of the Verizon Wireless records and determined that
only telephone number 323-376-5193 utilized all of the Selected
Verizon Wireless IP Addresses at those specific dates and times.

---

[5] UTC is an acronym for "Coordinated Universal Time," the
primary time standard by which the world regulates its clocks
and time.

Verizon Wireless provided a record of the subscriber information
for 323-376-5193 which included the following:

        a.   Name:  Joseph Nassar

        b.   Effective Period:  08/18/2019 to present

        c.   Additional telephone number:  626-335-3595

        d.   Address:  413 Underhill Drive, Glendora, CA
91741, the SUBJECT PREMISES.

    31.  I conducted a search utilizing an online tool and
determined that Frontier Communications was the service provider
for telephone number 626-335-3595.  On April 28, 2020, I served
an administrative subpoena to Frontier Communications for
information regarding telephone number 626-335-3595.  On April
29, 2020, Frontier Communications responded to the subpoena by
providing a record with the following information:

        a.   Length of Service: September 4, 2001 to present

        b.   Account Name:  Joseph A. Nassar

        c.   Account Address: the SUBJECT PREMISES

        d.   Service Type:  Residence - FIOS Digital Voice and
FIOS Internet

    32.  On August 5, 2020, I conducted a search for telephone
number 323-376-5193 in an internal FBI database which produced
an Experian record with the following information:

        a.   Date of Record:  May 4, 2020

        b.   Name:  Jonathan Nassar

      c.   Cellular:  323-376-5193

      d.   Address: the SUBJECT PREMISES

33.  On August 6, 2020, I obtained Glendora Police Department report for incident number 18-31259.  This report described an incident on October 18, 2018 when Jonathan Nassar physically attacked two 15 year old males and a 24 year old male.  Jonathan Nassar was arrested during a traffic stop while driving a white Toyota Camry with California license plate 7KBR530.  The incident report included the following subject information:

      a.   Name:  Jonathan J. Nassar

      b.   Date of Birth:  March 13, 1989

      c.   Telephone number:  323-376-5193

      d.   Address: the SUBJECT PREMISES

34.  On April 10, 2020, I conducted surveillance at the SUBJECT PREMISES.  At approximately 9:06 a.m., I observed a white Toyota four-door sedan with California license plate 7KBR530 parked in the driveway of the SUBJECT PREMISES.  A search of the California Law Enforcement Telecommunication System determined that California license plate 7KBR530 was registered to Jonathan Joseph Nassar at the SUBJECT PREMISES.

35.  On April 11, 2020, a search for Joseph Nasser was conducted in the California Law Enforcement Telecommunication System with the following results:

19

a.   Name:  Joseph A Nasser

b.   California Driver License:  N3103060

c.   Born:  January 1, 1955

d.   Current mailing address as of November 30, 2012:
the SUBJECT PREMISES.

36.   On April 11, 2020, a search for Jonathan Joseph Nasser
was conducted in the California Law Enforcement
Telecommunication System with the following results:

a.   Name:  Jonathan Joseph Nasser

b.   California Driver License:  D9915348

c.   Born:  March 13, 1989

d.   Current mailing address as of July 16, 2012: the
SUBJECT PREMISES.

37.   On December 5, 2018, Jonathan Joseph Nassar was
convicted of one count of California Penal Code 245(A)(4)
(assault by means likely to produce great bodily injury) and
sentenced to three years probation.  On September 10, 2020, I
received a record from Los Angeles County Probation which listed
the SUBJECT PREMISES as Jonathan Joseph Nassar's permanent
residence and 323-376-5193 as his telephone number.

38.   On September 16, 2020, I conducted surveillance at the
SUBJECT PREMISES.  At approximately 10:20 a.m., I observed an
adult male exit the north side of the residence, retrieve a
trash container from the curb, and return to the residence.  The
adult male appeared consistent with the photograph and physical

description of Jonathan Joseph Nassar as documented in
California Driver License D9915348.

## VII. TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE SEXUAL INTEREST IN CHILDREN

39.   Based on my training and experience, and the training
and experience of other law enforcement officers with whom I
have had discussions, I have learned that there are certain
characteristics common to individuals with a sexual interest in
children and images of children:

a. Individuals who have a sexual interest in children or
images of children may receive sexual gratification, stimulation,
and satisfaction from contact with children; or from fantasies they
may have viewing children engaged in sexual activity or in sexually
suggestive poses, in person, in photographs, or in other visual
media; or from literature describing such activity.

b. Individuals who have a sexual interest in children or
images of children may collect sexually explicit or suggestive
materials in a variety of media, including photographs, magazines,
motion pictures, videotapes, books, slides, and/or drawings or
other visual media.  This includes collecting images or videos
traded with other like-minded individuals through online messaging
applications such as LiveMe.  Individuals who have a sexual
interest in children or images of children oftentimes transfer,
maintain, and store such materials, and use them for their own

21

sexual arousal and gratification.  Further, they may use these
materials to lower the inhibitions of children they are attempting
to seduce, to arouse the selected child partner, or to demonstrate
the desired sexual acts.

c. Individuals who have a sexual interest in children or
images of children sometimes possess hard copies of child
pornography, such as pictures, films, video tapes, magazines,
negatives, photographs, and etcetera.  As digital technology has
developed, individuals with a sexual interest in children or images
of children have become much more likely to maintain child
pornography, including materials they may have obtained from, or
shared with, other individuals through chat and file-sharing
applications in digital or electronic format, stored either on
digital devices or in remote storage locations on the Internet.
Regardless of whether these individuals collect their child
pornography in hard copy or digital format, they may maintain their
child pornography for a long period of time, even years.  They
usually maintain these collections in a safe, secure, and private
environment, such as their homes, vehicles, or nearby, so they can
view the child pornography at their leisure.  These collections are
typically highly valued.

d. Individuals who have a sexual interest in children or
images of children also may correspond with and/or meet others to
share information and materials; rarely destroy correspondence from

22

other child pornography distributors/ collectors; may conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  Additionally, individuals who receive or share child pornography with other online users often keep backups and copies of those materials on other digital or storage devices in their homes, cars, or other nearby locations.

e. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

40.  Based on my training and experience, as well as my conversations with digital forensics agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via computer.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files,

23

may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Because computer evidence is recoverable after long periods of time, and because there is probable cause to believe that persons at the SUBJECT PREMISES were once in possession of child pornography and likely obtained it from some as yet unidentified source, there is probable cause to believe that evidence of activity related to the distribution, receipt, and possession and distribution of child pornography will be found at the SUBJECT PREMISES and on the SUBJECT PERSON.

VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

41.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

24

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

      a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a

thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

26

could contain as many as approximately 450 full run movies or
450,000 songs.

       d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[6]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed

---

     [6] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

      e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly able to be segregated from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file).

Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on

29

the digital device.  Evidence of the absence of particular data
on a digital device is not able to be segregated from the
digital device.  Analysis of the digital device as a whole to
demonstrate the absence of particular data requires specialized
tools and a controlled laboratory environment, and can require
substantial time.

          g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby

traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

39.  As discussed above, based on my training and
experience, and from information provided by LiveMe, I believe
that digital devices used by the SUBJECT ACCOUNT will be found
during the search, including possibly an iPhone 7 device.
Several versions of this device have either facial recognition
features or fingerprint sensors, as described below.

a.  I know from my training and experience and my
review of publicly available materials that several hardware and
software manufacturers offer their users the ability to unlock
their devices through biometric features in lieu of a numeric or
alphanumeric passcode or password.  These biometric features
include fingerprint-recognition, face-recognition, iris-
recognition, and retina-recognition.  Some devices offer a
combination of these biometric features and enable the users of
such devices to select which features they would like to
utilize.

b.  If a device is equipped with a fingerprint
scanner, a user may enable the ability to unlock the device

through his or her fingerprints.  For example, Apple Inc.

("Apple") offers a feature on some of its phones and laptops

called "Touch ID," which allows a user to register up to five

fingerprints that can unlock a device.  Once a fingerprint is

registered, a user can unlock the device by pressing the

relevant finger to the device's Touch ID sensor, which on a cell

phone is found in the round button (often referred to as the

"home" button) located at the bottom center of the front of the

phone, and on a laptop is located on the right side of the

"Touch Bar" located directly above the keyboard.  Fingerprint-

recognition features are increasingly common on modern digital

devices.  For example, for Apple products, all iPhone 5S to

iPhone 8 models, as well as iPads (5th generation or later),

iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro

laptops with the Touch Bar are all equipped with Touch ID.

Motorola, HTC, LG, and Samsung, among other companies, also

produce phones with fingerprint sensors to enable biometric

unlock by fingerprint.  The fingerprint sensors for these

companies have different names but operate similarly to Touch

ID.

        c.   If a device is equipped with a facial-recognition

feature, a user may enable the ability to unlock the device

through his or her face.  To activate the facial-recognition

feature, a user must hold the device in front of his or her

face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary to unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

        d.   While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared

light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

40.  In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

41.  I also know from my training and experience, as well

34

as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.  I do not
know the passcodes of the devices likely to be found during the
search.

        42.  In my training and experience, the person who is in

possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.  However, in my training and experience, that person
may not be the only user of the device whose physical
characteristics are among those that will unlock the device via
biometric features (such as with Touch ID devices, which can be
registered with up to five fingerprints), and it is also
possible that the person in whose possession the device is found
is not actually a user of that device at all.  Furthermore, in
my training and experience, I know that in some cases it may not
be possible to know with certainty who is the user of a given
device, such as if the device is found in a common area of a
premises without any identifying information on the exterior of
the device.  Thus, it will likely be necessary for law
enforcement to have the ability to require an individual
reasonably believed by law enforcement to be a user of the
device, to unlock the device using biometric features in the
same manner as discussed in the following paragraph.

43.  For these reasons, if while executing the warrant, law
enforcement personnel encounter a digital device that may be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel
to, with respect to an individual who is reasonably believed by
law enforcement to be a user of a biometric sensor-enabled

device that is located at the SUBJECT PREMISES and falls within
the scope of the warrant: (1) direct the use of individual's
thumb- and/or fingerprints on the device(s); and (2) hold the
device(s) in front of the individual's face with his/her eyes
open to activate the facial-, iris-, and/or retina-recognition
feature.  With respect to fingerprint sensor-enabled devices,
although I do not know which of the fingers are authorized to
access any given device, I know based on my training and
experience that it is common for people to use one of their
thumbs or index fingers for fingerprint sensors; and, in any
event, all that would result from successive failed attempts is
the requirement to use the authorized passcode or password.

42.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## IX. REQUEST FOR SEALING

43.  It is respectfully requested that this Court issue an
order sealing, until further order of the Court, all papers
submitted in support of this application, including the
application and search warrant affidavit.  I believe that
sealing is necessary because the items and information to be
seized is relevant to an ongoing investigation into criminal
conduct involving minor victims and as far as I am aware, the
targets of this investigation remain unaware that they are being
investigated.  Disclosure of the search warrant affidavit at

this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## X. CONCLUSION

44. Based on the foregoing, there is probable cause to believe that the evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2)(A) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), as described above and in Attachments B, will be found in a search of the SUBJECT PREMISES, as described in Attachment A-1, and/or the SUBJECT PERSON, as described in Attachment A-2 of this affidavit.

_____

Clint Wilmsen, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August 2020.

_____

UNITED STATES MAGISTRATE JUDGE

_____

39

<u>**ATTACHMENT A-1**</u>

<u>**PREMISES TO BE SEARCHED**</u>

1.    The premises to be searched (the "SUBJECT PREMISES")
is a single family residence located at 413 Underhill Drive,
Glendora, California 91741.  The SUBJECT PREMISES is located on
the corner of Underhill Drive and Elmgrove Drive.  The SUBJECT
PREMISES is a single level residence with a brown roof, yellow
stucco walls, white trim and dark window shutters.  The number
413 is painted in black numbers on a white background on the
curb in front of the white double-doors.  The structure includes
a two-car garage attached to the residence by a breezeway.  The
SUBJECT PREMISES includes any parking spaces, driveways,
garages, storage spaces, locked containers, and appurtenances.
The SUBJECT PREMISES also includes any vehicles parked in the
driveway or inside the SUBJECT PREMISES.  The SUBJECT PREMISES
also includes individuals reasonably believed to be a residents
of the SUBJECT PREMISES inside SUBJECT PREMISES at the time of
the search.

2.    The search of the SUBJECT PREMISES includes a search
of any digital devices located at the SUBJECT PREMISES,
including in any vehicles, storage spaces, locked containers,
structures, appurtenances, or on any person at the SUBJECT
PREMISES at the time of the search.

The residence is depicted below:

**<u>Overhead View</u>**



413 Underhill Drive

**<u>Front View</u>**



ii

## Side View



## Front Door



## <u>ATTACHMENT A-2</u>

### <u>PERSON TO BE SEARCHED</u>

2.    The person of Jonathan Joseph Nassar ("J.J. NASSAR"); date of birth March 13, 1989.  Law enforcement database records lists him as having black hair and brown eyes.  California Department of Motor Vehicle Records states that J.J. NASSAR's California Driver's License number is: D9915348.

3.    The search of the aforementioned person shall include:

a. Any and all clothing and personal belongings, any digital devices, backpacks, wallets, briefcases, purses, and bags that are within J.J. NASSAR's immediate vicinity and control at the location where the search warrant is executed.


Photograph of J.J. NASSAR dated August 12, 2019:



**ATTACHMENT B**

ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), namely:

a.   Child pornography, as defined in Title 18, United States Code, Section 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, in interstate commerce, including by computer, involving any visual depiction

i

of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(B).

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that discuss, depict, or evidence any minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f.   Any and all records, documents, programs, applications, messages, notes, materials, or items that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

g.   Any and all records, documents, programs, applications, notes, materials, or items, including electronic mail and electronic messages, which discuss or otherwise may be related to the sex exploitation of children.

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to LiveMe or Mega.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

l.   Any digital device, including but not limited to a Samsung Note 8, which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   Any phone book, call log, or call records, digital or otherwise.

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

            viii.     records of or information about Internet Protocol addresses used by the device;

            ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related

communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, with respect to an individual reasonably believed to be a resident of the SUBJECT PREMISES and/or J.J. NASSER, and is the user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and/or is on J.J. NASSER's person, and which falls within the scope of the warrant, law enforcement personnel are authorized to: (1) direct the individual to depress the thumb- and/or fingerprints of the individual onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the individual with his/her eyes open (which law enforcement may direct) to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x